**In re J. ALLAN STEEL COMPANY, Debtor.**

**Official Committee of Unsecured Creditors of J. Allan Steel Company, Plaintiff,**

v.

**Winner Steel Services, Defendant.**

**Bankruptcy No. 03–23846 BM.
Adversary No. 04–2027 BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 7, 2005.

Kathryn C. Finnerty, DKW Law Group, LLC, Pittsburgh, PA, for Plaintiff.

James J. Brink, Brink Law Offices, Pittsburgh, PA, for Defendant.

### *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

Pursuant to the authority granted by the confirmed chapter 11 plan of debtor J. Allan Steel Company, the Official Committee of Unsecured Creditors (the "Committee")has brought this adversary action against Winner Steel Services. The Committee alleges that certain payments debtor made to Winner during the ninety-day period prior to the filing of debtor's voluntary bankruptcy petition were preferences for purposes of § 547(b) of the Bankruptcy Code. It seeks to avoid the preferences and to recover them for the benefit of debtor's bankruptcy estate.

Winner asserts that to the extent the payments were preferences, they may not be avoided because they fall within the exception to avoidance for ordinary-course transactions found at § 547(c)(2) of the Bankruptcy Code.

Judgment will be entered in favor of Winner and against the Committee for reasons stated below. Although the payments qualify as preferences, they may not be avoided.

### — FACTS —

Both debtor and Winner are in the business of processing and finishing steel products for customers. Debtor also is a customer of Winner, which processes and

finishes steel products for debtor. Neither of them is a steel producer.

The business relationship between debtor and Winner began in April or May of 1998. On May 5, 1998, Winner issued an invoice for steel it had processed for debtor. It ceased doing business with debtor on March 28, 2003.

There was no written agreement between debtor and Winner concerning payment terms. Every invoice issued by Winner, however, stated that the payment term was "Net Thirty Days", with a discount of one-half percent if paid in full within ten days of the invoice date.

Debtor issued a check payable to Winner in the amount of $41,887 on February 14, 2003. Winner received the check on February 20, 2003, and deposited it into an account some time thereafter. The check paid in full the following four invoices: (1) No. 129650 in the amount of $12,129.00; (2) No. 129651 in the amount of $11,729; (3) No. 130415 in the amount of $8,981; and No. 130524 in the amount of $9,048. Payment of the first two invoices was received by Winner sixty-six days after they were issued. Payment of the third and fourth invoices was received forty-five days and forty-four days, respectively, after they were issued.

Debtor filed a voluntary chapter 11 petition on March 28, 2003. The accompanying schedules disclosed assets with a total declared value in the amount of $22,922,688 and liabilities totaling $26,688,047. A total of $9,792,943 of this latter amount was owed to general unsecured creditors. Winner was identified as having a non-contingent, undisputed general unsecured claim in the amount of $40,188.

Debtor's confirmed plan of reorganization provided, among other things, that the Committee would have sole and exclusive authority and discretion to bring and prosecute avoidance actions it deemed appropriate. Any recovery in such actions ultimately would inure to the benefit of creditors having allowed general unsecured claims.

Exercising this authority, the Committee commenced the above adversary action against Winner. The Committee maintained that debtor's payment of the four above invoices totaling $40,188 constituted a preferential transfer for purposes of § 547(b) of the Bankruptcy Code. It sought to avoid the entire amount of the payment [1] and to recover it for the benefit of debtor's bankruptcy estate in accordance with § 550(a)(1) of the Bankruptcy Code.

In its answer to the complaint, Winner asserted that payment of the above invoices was made in the ordinary course and consequently are excepted from avoidance by virtue of § 547(c)(2).

The matter was tried, at which time the Committee and Winner had an opportunity to offer evidence on the issues remaining in the case. The matter is now ready for decision.

— DISCUSSION —

— I —

### Were The Payments Preferential?

The Committee seeks to avoid debtor's payment of the above two invoices totaling No. 129650 in the amount of $12,129 and invoice No. in the amount of $11,729, which together total $23,858, were preferences and are not excepted from avoidance by virtue of § 547(c)(2). The Committee still seeks to avoid and to recover these payments for the benefit of the bankruptcy estate.

---

1. The Committee subsequently stipulated that invoices No. 130415 in the amount of $8,981 and No. 130524 in the amount of $9,048 were paid in the ordinary course of business in accordance with § 547(c)(2) and are excepted from avoidance for that reason. It continues to assert, however, that payment of invoice

$23,858 in accordance with 11 U.S.C. § 547(b), which provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; . . . and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

■■■ The Committee has the burden in this case of proving that a transfer is avoidable as a preference in accordance with § 547(b). 11 U.S.C. § 547(g). It must do so by a preponderance of the evidence. *In re Roblin Industries, Inc.*, 78 F.3d 30, 35 (2d Cir.1996).

The parties have stipulated with respect to the two invoices remaining at issue that subparts (1), (2), (4) and (5) are satisfied in this instance. Winner has not, however, stipulated that subpart (3) also is satisfied.

■■■ Winner instead merely stipulated that, as a matter of law, debtor is presumed to have been insolvent when the invoices were paid. See 11 U.S.C. § 547(f). This provision gives rise to a rebuttable presumption that debtor was insolvent during the 90–day preference period. *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 221 n. 4 (3d Cir.1994). This presumption places the burden on the creditor to come forward with evidence to rebut the presumption. The ultimate burden of proving debtor's insolvency, however, remains with the Committee in this case. *Official Committee of Unsecured Creditors of RML, Inc. v. Sabrina, S.P.A. (In re RML, Inc.)*, 195 B.R. 602, 611 (Bankr.M.D.Pa.1996).

■■■ Winner offered no credible evidence at trial to rebut the presumption that debtor was insolvent when the payment of the invoices at issue was received by Winner. Testimony by Winner's credit manager that he was not aware of debtor's insolvency when the payment was received does not suffice in this regard.

We therefore conclude that each and every requirement of § 547(b) has been met and that payment of the invoices remaining at issue qualify as preferences for purposes of § 547(b).

— II —

§ 547(c)(2)

**Were The Payments Made in the Ordinary Course of Business?**

Because they are preferences, the Committee may set aside and recover for the benefit of creditors the payment for the above two invoices *unless* they "fall within one of the statutory safe harbors for otherwise preferential transfers". *In the Matter of J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66, 69 (3d Cir. 1989). The initial clause of § 547(c) specifies that the trustee may avoid a preferential transfer "[e]xcept as provided in sub-

section (c)" of § 547 of the Bankruptcy Code.

Winner asserts as an affirmative defense that debtor's payment of the above invoices totaling $23,858 lies within the "safe harbor" set forth at 11 U.S.C. § 547(c), which provides as follows:

(c) the trustee may not avoid under this section a transfer—. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business . . . of the debtor and the transferee;

(B) made in the ordinary course of business . . . of the debtor and the transferee; and

(C) made according to ordinary business terms.

■ Subparts (A), (B) and (C) are conjunctive, not disjunctive. *In the Matter of J.P. Fyfe*, 891 F.2d at 69. Because it seeks to find refuge in the "safe harbor" found at § 547(c)(2), Winner has the burden of proof on this issue. It must prove, by a preponderance of the evidence, that each of these conjuncts is satisfied in this case. *U.S. Trustee v. First Jersey Securities, Inc.*, 180 F.3d 504, 512 (3d Cir.1999).

The Committee has stipulated that § 547(c)(2)(A) is satisfied. The debts incurred by debtor as reflected in invoice No. 129650 and invoice No. 129651 were incurred "in the ordinary course of business" of debtor and Winner. It denies, however, that § 547(c)(2)(B) and (C) are satisfied. Debtor's payment of the invoices, it contends, were neither made "in the ordinary course of business" nor made "according to ordinary business terms".

## § 547(c)(2)(B): Were the Payments Made in the Ordinary Course Of Business Of Debtor And Winner?

The payments in question were made on or about February 20, 2003, the date on which Winner received a check from debtor in the amount of $41,887. As was noted previously, it paid in full the amounts due for invoice No. 129650 and invoice No. 129651. The total amount of these invoices was $23,858. The check also paid in full the amounts due for invoice No. 130415 in the amount of $8,981 and invoice No. 130524 in the amount of $9,048. Only the first two invoices are in dispute. The Committee has conceded that the latter two invoices lie within the scope of § 547(c)(2) and therefore may not be avoided.

■ Winner received the check in question sixty-six days after invoice No. 129650 and invoice No. 129651 were issued and forty-five days and forty-four days, respectively, after invoice No. 130415 and invoice No. 130524 were issued. While the record does not indicate the exact date on which the drawee bank honored the check, we can safely infer that the bank did so on or after February 20, 2003,[2] and thus within the 90–day preference period.

■ What qualifies as "ordinary" for purposes of § 547(c)(2) is not defined in the Bankruptcy Code. *J.P. Fyfe* teaches that the determination as to what is "in the

---

**2.** The date on which a transfer by check is deemed to occur for purposes of § 547(b) is the date on which the drawee bank honors it, not when the check is presented to the payee. *Barnhill v. Johnson*, 503 U.S. 393, 394–95, 112 S.Ct. 1386, 1388, 118 L.Ed.2d 39 (1992). Notwithstanding this, the parties have persisted in calculating the number of days for which an invoice was outstanding from the date on which the invoice was issued by Winner to date on which Winner *received* the check. We will utilize their method for calculating this interval even though it is erroneous. So doing will not alter the outcome of this case.

ordinary course of business" for purposes of § 547(c)(2)(B) is subjective. A court must, in other words, determine if the transfer was ordinary *as between the debtor and the creditor*. Factors such as the timing, the amount, and the manner of payment may be significant in making this determination. *In re First Jersey Securities*, 180 F.3d at 512.

■ After reviewing the approximately five-year period during which debtor had an on-going business relationship with Winner, we conclude that payment of the two invoices remaining at issue was made in the ordinary course of that business relationship. The interval between issuance of the invoices and their payment during the 90–day preference period is sufficiently similar to the interval that was extant during the course of that relationship to warrant the inference that payment of the two contested invoices was "ordinary" as between debtor and Winner for purposes of § 547(c)(2)(B).

The interval between the date on which Winner issued the two invoices—i.e., December 16, 2002, and the date on which Winner received the check which paid the invoices—i.e., on February 20, 2003—was sixty-six days. This lies well within the range of such intervals for three of the five years during which they did business with one another.

During the first year preceding debtor's bankruptcy filing—i.e., from March 28, 2003, through March 29, 2002—, the interval ranged from forty-one days to seventy-nine days. The range during the fourth year prior to the bankruptcy filing—i.e., from March 28, 2000, to March 29, 1999—, was from four days to one hundred and

twenty-one days. The range during the fifth year—i.e., from March 28, 1999, to May 5, 1998, the date of the first invoice issued by Winner—was thirty days to seventy-two days.[3]

The sixty-six-day interval between the invoice date and the receipt of payment for the contested invoices lies outside the range for only the second and third years preceding the bankruptcy filing. The range for the second year—i.e., from March 28, 2002, through March 29, 2001—, was thirty-three days to fifty-four days. The range for the third such year—i.e., March 28, 2001, through March 29, 2000—, was forty-three days to fifty-seven days.

It is not significant in our estimation that the interval for the two invoices at issue here exceeds the range for these two years.

It would unrealistic to require the interval of the contested payments made during the preference period to fall within the range for each and every year prior to debtor's bankruptcy filing. As is the case with steel producers, the business of steel processors is cyclical and can vary considerably from one year to the next. Because of this, it stands to reason that the interval in question may be greater in some years than in others. To hold otherwise would gut the ordinary-course exception and make it nearly impossible to satisfy.

■ The Committee also would have us disregard the year immediately preceding debtor's bankruptcy filing when inquiring whether § 547(c)(2)(B) is satisfied in this instance. According to the Committee, this period is not a good indication of what constituted ordinary business as be-

---

**3.** In determining this range, we have excluded as an aberration one payment which was received four hundred and forty-five days after Winner issued the invoice. This interval exceeds the next greatest interval by more than three hundred days. Were we to include it in our calculation, the range for the fifth year prior to debtor's bankruptcy filing would be correspondingly greater.

tween debtor and Winner because debtor was experiencing severe financial problems during this year and was far from "healthy".

We decline to do as the Committee suggests. No evidence was offered at trial indicating that debtor was experiencing serious financial problems and had begun a precipitous descent into bankruptcy a full year before its bankruptcy filing. Without such evidence, we are reluctant to disregard the business dealings between debtor and Winner during this period in determining what was "ordinary" as between debtor and Winner for purposes of § 547(c)(2)(B).

In support of its position, the Committee alludes to some unidentified statement attributed to the court to the effect that debtor was experiencing severe financial difficulties during this period. We do not recall making such a statement and suspect that the Committee has taken some statement by the court out of context.

■ One final observation might be appropriate at this juncture. The check Winner received on February 20, 2003, was payment for two invoices in addition to the two invoices presently under consideration. This led us to ponder whether payment of multiple invoices with a single check was a departure from the ordinary course of business between debtor and Winner.

Further review of the payment history, however, reveals that this practice was common. Debtor had paid more than four invoices at one time with a single check on numerous occasions during each of the five years comprising their five-year business relationship. The maximum number of invoices paid with a single check was twelve in August of 2002.

We conclude in light of the foregoing that Winner has met its burden of proof

with respect to § 547(c)(2)(B). It has demonstrated, by a preponderance of the evidence, that payment of invoice No. 129650 and invoice 129651 was made in the ordinary course of business as between debtor and Winner.

### § 547(c)(2)(C): Were The Payments Made According To Ordinary Business Terms ?

It remains to be determined whether the payment debtor made to Winner for invoice No. 129650 and invoice No. 129651 during the ninety-day preference period was made according to ordinary business terms for purposes of § 547(c)(2)(C). Because this requirement must be satisfied separately from § 547(c)(2)(B), we must when making this determination go beyond ascertaining what was ordinary vis-a-vis debtor and Winner. *In re Molded Acoustical Products*, 18 F.3d at 223–24.

■ The phrase "according to ordinary business terms" refers, for purposes of § 547(c)(2)(C), to the broad *range* of payment terms found in businesses similar in some general way to the creditor. Only practices that are so unusual as to fall outside that broad range are deemed to be extraordinary and to fall outside the scope of § 5476(c)(2)(C). *Molded Acoustical Products*, 18 F.3d at 224. Except for one modification, the Third Circuit has adopted the standard formulated by the Seventh Circuit in *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993). The only difference is the substitution of the word "unusual" for the word "idiosyncratic".

The Third Circuit also has "embellished" the standard found in *Tolona Pizza* with the additional proposition that § 547(c)(2)(C) "countenances a greater departure" from that broad range of terms in the industry the longer the pre-solvency relationship between the debtor and the

creditor was "solidified". *Molded Acoustical Products*, 18 F.3d at 220.

Several observations concerning this "embellished" standard are appropriate before we apply it to the facts of this case.

■ Although the creditor is required to produce evidence of an industry standard, § 547(c)(2)(C) is "quite accommodating" in this regard. The industry need only be "similar in some general way" to the creditor in question. *Molded Acoustical Products*, 18 F.3d at 224.

The above standard does not provide a "bright line approach" for ascertaining if the business practices of the creditor conform to those of an industry. The phrase "ordinary business terms" refers to a "broad range" of payment terms common in an industry that is similar in some general way to the creditor. *Molded Acoustical Products*, 18 F.3d at 224.

■ Finally, the duration of the business relationship of a debtor and a creditor is "logically pertinent" to determining the extent to which a creditor may depart from the broad range of credit terms extant in the industry while still remaining within the confines of § 547(c)(2)(C). More precisely, the more "cemented" (as measured by its duration) the pre-insolvency business relationship between debtor and creditor, the more the creditor may vary its credit terms from the range of terms prevailing in the industry without going outside the scope of § 547(c)(2)(C). The likelihood of "unfair overreaching" decreases as the duration of the pre-insolvency relationship increases. *Molded Acoustical Products*, 18 F.3d at 224–25.

Conversely, when the relationship between debtor and creditor is of recent origin or began only shortly before or after debtor "sailed into financially troubled seas", the credit terms will have to "endure a rigorous comparison" to the range of credit terms prevailing in the industry. There is no "baseline" in such event for confirming that debtor and creditor would have operated under the same terms had debtor's bankruptcy loomed. *Molded Acoustical Products*, 18 F.3d at 225–26.

■ However, the extent to which credit terms may vary from the industry norm when debtor and creditor established a relationship long before debtor's insolvency is not unbounded. If the operative terms between debtor and creditor "depart grossly" from the industry norm, a preferential transfer is deemed to be "unusual" and thus outside the scope of § 547(c)(2)(C). *Molded Acoustical Products*, 18 F.3d at 226. How much of a departure from the range of industry terms is allowed before it is considered as "depart[ing] grossly" is undefined and must be determined on a case-by-case basis.

In addition to articulating a standard for determining whether a preferential transfer was "made in the ordinary course of business" for purposes of § 547(c)(2)(C), the Third Circuit has formulated a three-step procedure for its application.

■ We first must determine the broad range of terms on which businesses similar in some general way to the creditor provided credit to businesses comparable to the debtor on some level. Next we must scrutinize the length of the relationship between debtor and creditor to estimate "the size of the customized window" surrounding the industry which was established in the first step. Finally, we must determine whether the business relationship between debtor and creditor "remained relatively stable" leading into and during the insolvency period. *Molded Acoustical Products*, 18 F.3d at 227.

### (A.) The Range Of Operative Payment Terms In The Industry.

■ To establish the range of payment terms extant in an industry similar in some way to it, Winner offered into evidence on-line reports prepared by Dunn & Bradstreet providing financial information for companies which, like Winner, process steel products for customers. Included were: Nucor Corporation: Weirton Steel Corporation; United States Steel Corporation; Roanoke Electric Steel Corporation; WHX Corporation; Bethlehem Steel Corporation; AK Steel Holdings Corporation; and Rouge Industries, Incorporated.[4]

While these companies are dissimilar to Winner to the extent that they produce steel, they are similar to Winner to the extent that they also process steel for others. They therefore bear a sufficient similarity to Winner to comprise a relevant industry for purposes of § 547(c)(2)(C).

Of particular significance for present purposes is the information concerning the average number of days that each company's receivables were outstanding before they were paid. The information provided covered each of the following calendar years: January 1, 2000, to December 31, 2000; January 1, 2001, to December 31, 2001; and January 1, 2002, to December 31, 2002. Although these calendar years do not correspond exactly to the three years preceding debtor's bankruptcy filing on March 28, 2003, they nonetheless provide a snapshot of the range of payment terms in the industry over a three-year period ending only a few days prior to the onset of the ninety-day preference period preceding debtor's bankruptcy filing.

After averaging the industry-wide interval between issuance of an invoice and the date of its payment for each of the companies for the three-year period beginning on January 1, 2000, and ending on December 31, 2002, we find that this interval spans a broad range from a low of 27.44 days (Rouge Industries) to a high of 50.80 days (Roanoke Electric Steel Corp.). The difference between these extremes is 23.36 days.

### (B) The Length Of The Business Relationship Between Debtor And Winner.

The next step is to determine the duration of the business relationship between debtor and Winner prior to debtor's insolvency.

Their business relationship began in late-April or early-May of 1998. The earliest invoice of record is dated May 5, 1998. Because no evidence was offered concerning when debtor became insolvent, we will assume in accordance with § 547(g) of the Bankruptcy Code that debtor became insolvent on December 29, 2002, ninety days before it filed a bankruptcy petition.

It accordingly follows that the duration of the business relationship between debtor and Winner prior to debtor's presumed insolvency was fifty-eight months. Winner ceased doing business with debtor on March 28, 2003, when debtor filed its bankruptcy petition. If we calculate to this time, their business relationship lasted sixty-one months from start to finish.

We next must utilize these findings to determine the "size of the customized window" surrounding the above industry range. That is to say, we must determine the extent to which the interval between the date on which Winner issued invoice No. 129650 and invoice No. 129651 and the

---

4. Because the Committee did not object to the admissibility of these on-line reports, we will not address the issue of their admissibility.

date on which it received payment for them may stray beyond the industry range of 27.44 days to 50.80 days and still remain within the confines of § 547(c)(2)(C).

### (C) The Stability Of The Business Relationship Between Debtor And Winner.

Merely determining the duration of the business relationship of debtor and Winner does not suffice for determining the extent to which the credit terms operative between debtor and Winner during the course of their relationship may depart from the range of payment terms extant in the industry. We must determine in this context whether their relationship "remained relatively stable leading into and throughout the insolvency period". *Molded Acoustical Products*, 18 F.3d at 227.

This is implicit in the proposition that the more "cemented (as measured by its duration)" the pre-insolvency relationship between a debtor and a creditor is, the further the creditor may stray from the industry norm and "yet remain within the safe harbor of § 547(c)(2)(C)". A relationship is "cemented" when it is of lengthy duration and has remained "relatively stable" throughout.

The rationale for this is not difficult to figure. If the relationship is of long standing and relatively stable, the payment terms during the relationship are indicative of an arm's-length relationship. The likelihood of overreaching by the creditor during debtor's insolvency is greatly diminished.

The average interval between the date on which Winner issued an invoice and the date on which it received payment for it from debtor throughout their relationship was 50.94 days. The average interval for *all* invoices paid during the preference period was 54.20 days. This difference of 3.26 days is not significant and indicates

that the relationship between debtor and Winner was relatively stable throughout its existence.

This in turn leads us to conclude that the extent to which the average interval before Winner received payments during the preference period—i.e., 54.20 days—exceeds the upper limit of the range in the industry—i.e., 50.80 days—does not amount to a gross departure from the industry norm but instead falls comfortably within the scope of § 547(c)(2)(C).

A few observations are in order before we conclude our analysis.

We included the intervals between issuance of an invoice and Winner's receipt of a check from debtor occurring during the *preference* period when determining the average interval during the course of their *entire* relationship. This inclusion, we believe, is not significant and does not affect the outcome of this case. If we excluded these intervals from our calculation, the difference between the average interval during the entire course of their relationship and the interval during the preference period would increase by perhaps one-tenth of a percentage point.

Also, we averaged the interval for *all* invoices for which debtor paid *during* the preference period and not just for invoice Nos. 129650 and invoice No. 129651. We believe that this approach is implicit in the instruction that we should determine how stable the business relationship was "leading into and *throughout the insolvency period*". *Molded Acoustical Products*, 18 F.3d at 227.

If we limited our analysis of the average interval during the preference period to just these two invoices, each of which was sixty-six days, the extent to which the average interval during the preference period exceeds the average upper limit of the range extant in the industry—i.e., 50.80

days—would increase from 3.40 days to 15.20 days.

The Third Circuit did not categorically reject the possibility that a thirteen-day departure from the industry norm was within the "customized window" surrounding the industry norm. It sidestepped the issue because the appeal in the case could be resolved on other grounds. *Molded Acoustical Products,* 18 F.3d at 227.

The duration of the relationship in that case was twenty-one months. *Molded Acoustical Products,* 18 F.3d at 220. The relationship between debtor and Winner in this case lasted sixty-one months, nearly three times longer. The reluctance of the Third Circuit to categorically conclude that a thirteen-day interval was outside of the "customized window" in that case leaves open the possibility that a discrepancy of 15.20 days may, under the right circumstance, also fit within the "customized window" surrounding the norm of a relevant industry.

Were it necessary to consider only invoice No. 129650 and invoice No. 129651 in determining whether the interval pertaining to payments made during the preference period lies within the "customized window", we would conclude that a departure of 15.2 days from the industry norm was not so "gross" or "unusual" as to place it beyond the scope of § 547(c)(2)(C).

We conclude in light of the foregoing that Winner has met its burden of proving that the payment of invoice No. 129650 and invoice No. 129651 satisfies all of the requirements of § 547(c)(2) of the Bankruptcy Code. Although payment of these invoices constituted a preference for purposes of § 547(b), they are excepted from avoidance.

An appropriate order shall issue.

**ORDER OF COURT**

AND NOW at Pittsburgh this *7th* day of *March,* 2005, for reasons stated in this memorandum opinion, it hereby is **OR-DERED, ADJUDGED** and **DECREED** that **JUDGMENT** is entered in **FAVOR** of defendant Winner Steel Services and **AGAINST** the Official Committee of Unsecured Creditors of debtor J. Allan Steel Company.

It is **SO ORDERED.**